w

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

CHERYL RAMPTON,

        Plaintiff,

    v.

ANTHEM BLUE CROSS LIFE AND
HEALTH INS. CO.,

        Defendant.

Case No.  23-cv-03499-RFL (RMI)

**ORDER RE: DISCOVERY DISPUTE**

Re: Dkt. No. 30

Now pending before the court is a discovery dispute letter brief through which Plaintiff requests to compel certain information which Defendant has redacted based on the attorney-client privilege and work-product doctrine given that those portions of the pertinent documents were included in communications with Defendant's in-house legal department and because the communications were made in anticipation of litigation. *See generally* Ltr. Br. (dkt. 30) at 1, 3. Plaintiff submits, *inter alia*, that the information should nevertheless be produced pursuant to the fiduciary exception to the attorney-client privilege and work-product doctrine. *Id*. at 1-3. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the court finds the matter suitable for disposition without oral argument. For the reasons stated below, Plaintiff's request to compel the information is granted in part and denied in part.

As the widow of Mr. Audie Roldan, Plaintiff Cheryl Rampton is the beneficiary of a group life insurance policy underwritten and issued by Defendant Anthem. *See* Compl. (dkt. 1) at 2. Before his passing, while he was an employee of Celigo, Inc., Mr. Roldan had participated – as an insured employee – in a group life insurance plan (the "Plan") created to provide life insurance benefits to Celigo employees. *Id*. Plaintiff has alleged that the Plan obligated Anthem to pay life

insurance benefits to Plaintiff in the event that Mr. Roldan died while insured under the Plan. *Id*. at 3. Plaintiff has further alleged that Mr. Roldan's coverage included $25,000.00 in basic life insurance benefits and $300,000.00 in voluntary life insurance benefits. *Id*.

In late 2022, Mr. Roldan passed away, and Plaintiff filed a claim for benefits. *Id*. at 3. Anthem agreed to pay the basic life insurance benefits, but denied the voluntary life insurance claim, stating that "in order, to be eligible for the voluntary coverage, evidence of insurability was needed since he was late enrolling for this benefit. According to our records no application was submitted to our Medical Underwriting department." *Id*. Plaintiff appealed the denial and explained that Mr. Roldan had never been informed that eligibility for voluntary life benefits required any evidence of insurability and that neither Anthem nor Celigo had ever provided him with an evidence of insurability application for him to complete. *Id*. Instead, Plaintiff contended that Mr. Roldan had been advised during the enrollment process that he was not on Anthem's list of enrollees who were required to provide evidence of insurability. *Id*. Plaintiff alleges that she then provided Anthem with evidence that Mr. Roldan had paid, and Anthem had accepted, premium payments for voluntary life insurance coverage – in light of which, she contended that an insurer cannot collect premiums on a life insurance policy and then subsequently deny a claim under that policy based on a failure to provide evidence of insurability. *Id*. (citing *Salyers v. Metropolitan Life Ins. Co.*, 871 F.3d 934, 941 (9th Cir. 2017)[1]. Anthem upheld the denial of the claim and Plaintiff instituted this litigation in July of 2023.

---

[1] *See id*. ("Providence knew or should have known that Salyers's 2014 coverage election required evidence of insurability, because Providence's system showed $250,000 in coverage. Despite having not received evidence of insurability from Salyers in 2014 or earlier, Providence began deducting premiums from Salyers's paycheck every two weeks between September 2013 and February 2014, in amounts corresponding to $500,000 in coverage for 2013 and $250,000 for 2014. Plus, just five days after Gary's death, having still not received evidence of insurability, Providence sent a letter to Salyers confirming coverage of $250,000. The deductions of premiums, MetLife and Providence's failure to ask for a statement of health over a period of months, and Providence's representation to Salyers that she had $250,000 in coverage were collectively so inconsistent with an intent to enforce the evidence of insurability requirement as to induce a reasonable belief that it had been relinquished."); *see also id*. at n.4 (explaining that while "[s]everal district courts in our circuit have held that waiver 'cannot be used to create coverage beyond that actually provided by an employee benefit plan[,]' [] [b]ut where, as here, premium payments have been accepted despite the plan participant's alleged noncompliance with policy terms, 'giving effect to the waiver . . . does not expand the scope of the ERISA plan; rather it provides the Plaintiff with an available benefit for which he paid.'") (citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

In November of 2023, Defendant produced a number of documents constituting the administrative record in this case. *See* Ltr. Br. (dkt. 30) at 1. Some of the documents were attended with redactions – as a result of which, Defendant submitted a privilege log, basing the redactions on assertions of the attorney-client privilege and the work-product doctrine. *Id.* at 9. Plaintiff contends that she is nevertheless entitled to the withheld information "because the documents were generated during the ERISA claims process when Anthem was acting as a fiduciary . . . [and] [t]here is no attorney-client privilege or work product protection for documents generated during an ERISA claim." *Id.* at 1 (citing *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999)).[2] Plaintiff's argument turns on the suggestion that Defendant was an ERISA fiduciary at the time it denied Plaintiff's life insurance claim because, "ERISA defines a fiduciary with respect to a plan to include a person who exercises any discretionary authority or discretionary control respecting management of such plan or has any discretionary authority or discretionary responsibility in the administration of such plan." *See* Ltr. Br. (dkt. 30) at 2-3 (quoting *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730, 745 (9th Cir. 2017) (internal quotations and citations omitted). Plaintiff then adds that "'[w]hen an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. §1002(21)(A)(iii).'" *See id.* at 3 (quoting *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000)[3] (citing *Pacificare Inc. v. Martin*, 34 F.3d 834, 837

---

[2] *Mett* explains the principle that, "[a]s applied in the ERISA context, the fiduciary exception provides that 'an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration.'" *Mett*, 178 F.3d at 1063 (quoting *Becher v. Long Is. Lighting Co.* (*In re Long Is. Lighting Co.*), 129 F.3d 268, 272 (2d Cir. 1997)). In *Mett*, the court explained that the fiduciary exception is rooted in two distinct rationales: (1) some courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration – thus, when "[v]iewed in this light, the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle"; and, (2) other courts have focused instead on the role of the trustee and have endorsed the notion that, as a representative for the beneficiaries of the trust which is being administered, the trustee is not the real client in the sense that he or she is personally being served – and, "[u]nderstood in this fashion, the fiduciary exception is not an 'exception' to the attorney-client privilege at all," instead, "it merely reflects the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place." *Mett*, 178 F.3d at 1063 (internal quotations and citations omitted).

[3] By way of background, in *Aetna Life Ins. Co. v. Bayona*, 223 F.3d at 1032, Evangeline Castro was a nurse employed by Good Samaritan Hospital. *Id.* Aetna Life Insurance Company issued a group insurance policy to Good Samaritan to fund insurance benefits offered by the hospital to its employees as part of its Bene-Flex

1    (9th Cir. 1994) ("Insurers can be ERISA fiduciaries if 'they are given the discretion to manage

2    plan assets or to determine claims made against the plan . . . An insurer will be found to be an

3    ERISA fiduciary if it has the authority to grant, deny, or review denied claims.'")[4] (quoting *Kyle*

4    *R.R. v. Pacific Admin. Serv.*, 990 F.2d 513, 517-18 (9th Cir. 1993)).

5         Plaintiff submits that Defendant "possesses the ultimate discretionary authority in deciding

6    whether it will pay or not pay claims out of its own coffers," and that "[t]he 60-page plan makes

7    clear that the plan was 'underwritten by Anthem' and 'Anthem . . . is financially responsible for

8    the payment of claims.'" Ltr. Br. (dkt. 30) at 3 (citing *King*, 871 F.3d at 746).[5] Drawing a parallel

9    with the facts at hand in *King*, Plaintiff notes that, here, Defendant reviewed and denied Plaintiff's

10   initial claim, reviewed the appeal, and issued a final denial of the claim; therefore, Plaintiff posits

11   that, like the insurer in *King*, Defendant's exercise of discretion in reviewing Plaintiff's claim and

12   her appeal means that Defendant was a fiduciary under ERISA. Plaintiff also points to other

13   _____

14   Plan, which was governed by ERISA. *Id*. While employed by Good Samaritan, Ms. Castro enrolled for
     coverage under the plan's life insurance program; and, according to her beneficiary designation, her sister,

15   Emelita Castro, was to receive 85% of the insurance proceeds in trust for Ms. Castro's children, while, Ms.
     Castro's husband of sixteen months, Rey Bayona, was to receive 15% of the proceeds. *Id*. After Ms. Castro's

16   death in 1994, however, Rey Bayona informed Aetna that he wished to claim a community property interest
     in 50% of the policy proceeds. *Id*. Faced with conflicting claims, Aetna filed a complaint in interpleader,

17   naming the decedent's husband and sister as defendants. *Id*. Emelita Castro answered this complaint, and
     filed counterclaims against Aetna, Good Samaritan Hospital, and the Bene-Flex Plan. *Id*. Aetna filed a motion

18   to dismiss Castro's counterclaims; and, requested discharge from liability after depositing the full of amount
     of the insurance proceeds with the district court. *Id*. The district court dismissed Castro's counterclaims and

19   discharged Aetna. *Id*. at 1033. On appeal, Castro argued, *inter alia*, that Aetna had no standing to bring an
     interpleader action under ERISA, because Aetna was not an ERISA fiduciary. *Id*.

20   [4] *See also id*. at 834-38 ("Pacificare points to evidence in the record that it had the discretion to approve or

21   deny claims. Martin does not dispute this evidence, but only maintains that the named administrator of the
     plan, not Pacificare, was the fiduciary. However, 'third party administrators . . . are not fiduciaries under

22   ERISA when they merely perform ministerial duties or process claims.' (quoting *Pacific Admin. Serv.*, 990
     F.2d at 516). Pacificare claims that the administrator named in the plan did not make discretionary decisions,

23   and Martin does not allege that the named administrator had more than ministerial responsibilities. Thus, we
     must conclude that Pacificare had discretionary duties and was a fiduciary for the purposes of section

24   1132(a)(3).").

25   [5] *See id*. ("Blue Cross processes and pays claims to plan participants and conducts the first-level appeal for

26   benefit denials. Although the [employer's claims review committee] conducts the second-level appeal, Blue
     Cross makes initial benefit determinations for all plan participants and makes final determinations for those

27   participants who do not appeal their claims to the [claims review committee]. This requires that Blue Cross
     interpret the Retiree Plan to determine whether to pay claims and whether to uphold benefit denials on appeal.

28   [] In short, Blue Cross has the authority to grant, deny, and review denied claims. Any one of these abilities
     would be sufficient to confer fiduciary status under ERISA. [] The district court erred by ruling that Blue
     Cross is not an ERISA fiduciary.") (internal citations omitted).

indicia of Defendant's discretionary authority. *See* Ltr. Br. (dkt. 30) at 3 ("Your insurance will become effective when we decide the evidence of insurability is satisfactory . . ."; "In any of these situations, you must give health evidence to us. This requirement will be met when we decide the evidence is satisfactory"; "You, or someone on your behalf, must give us written notice of a claim within 20 days after you incur a loss under this plan"; "Anthem . . . must notify you, within 90-days after they receive your claim for benefits, that they have it and what they determine your benefits to be.").

Plaintiff concludes by noting that "the only plan provisions quoted in Defendant's denial letter are taken straight from its own plan, not some supposed other plan not found in the administrative record." *Id.* In short, Plaintiff argues that Defendant's attempts to absolve itself of its fiduciary duties by claiming that Celigo was responsible for eligibility is unavailing because Defendant itself exercised control over eligibility decisions. *Id.* In other words, Plaintiff submits that Defendant was vested with the discretion to determine whether an applicant's evidence of insurability was "satisfactory"; but, pursuant to *Salyers v. Metropolitan Life Ins. Co.*, 871 F.3d 934, 939-941 (9th Cir. 2017), under the principles of agency, Defendant would remain responsible for any delegation of plan administration to Celigo.[6]

For its part, Defendant contends that it has only made limited redactions based on the attorney-client privilege and the work-product doctrine, and that, in any event, "Plaintiff does not cite binding authority demonstrating that the fiduciary exception applies to work product privilege [and] Plaintiff's request should be denied on this basis alone." *See* Ltr. Br. (dkt. 30) at 3-4. The court finds this suggestion to be disagreeable. "As is evident from the reasoning of *Hickman v.*

---

[6] *See id.* at 940-41 ("We cannot say whether Providence was acting with express actual authority as an agent of MetLife, because the contract and other relevant communications between Providence and MetLife are not in the record. However, we have no trouble concluding that Providence had apparent authority, and perhaps even implied actual authority, to enforce the evidence of insurability requirement on MetLife's behalf. Even when an insurer retains control over whether a submitted claim was eligible for benefits, a principal-agent relationship may still exist where the employer handles nearly all the administrative responsibilities. The district court found that the task of flagging policies for missing evidence of insurability was delegated to Providence, and Providence was responsible for ensuring that a statement of health or evidence of insurability accompanied Salyers' selection of coverage. We see no error in those findings. The Plan's enrollment guide informed plan participants that MetLife used the statement of health form to determine whether to approve coverage. MetLife retained final say on the form and contents of the statement of health document. Yet, MetLife played no part in collecting it from plan participants.").

*Taylor*, 329 U.S. 495, 510-11 (1947), the purpose of the work-product protection is to safeguard the efforts of the attorney on behalf of his [or her] client by preventing an adversary counsel from obtaining a free ride on the work of the attorney. The point of the rule is to protect the integrity of the adversary process." *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 320 (S.D.N.Y. 1991) (citing *United States v. Nobles*, 422 U.S. 225, 238-39 (1975)). The court believes that the issue must be viewed through the lens of the explanation provided in *Mett*, 178 F.3d at 1063 – namely, that the fiduciary exception is rooted in two distinct rationales: where some courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration (thus, finding that the attorney-client privilege must give way in the face of a competing legal principle), other courts have focused instead on the role of the trustee and have endorsed the notion that, as a representative for the beneficiaries of the trust which is being administered, the trustee is not the real client in the sense that he or she is personally being served (thus, finding that the fiduciary exception is not really an exception to the attorney-client privilege but rather a reflection of the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place). *Id*. Under either approach set forth above, there appears no legitimate reason to cabin the fiduciary exception in the manner urged by Defendant – that is to say, by rendering it applicable in the ERISA context to the attorney-client privilege, but inapplicable to invocations of the work-product doctrine, and there is a wealth of persuasive authority to support this approach. *See e.g.*, *Solis v. Food Emplrs. Labor Relations Ass'n*, 644 F.3d 221, 232-233 (4th Cir. 2011) ("Applying the logic of common law trusts from which the fiduciary exception to the attorney-client privilege was extrapolated to the ERISA context, several courts have found that the exception similarly applies to the work product doctrine, reasoning that a trustee's attorney should not withhold work product from the actual client, *i.e.* the trust beneficiaries . . . These persuasive authorities demonstrate that there is no legitimate basis on which to distinguish between the two privileges in the application of the fiduciary exception in the ERISA context."); *see also Durand v. Hanover Ins. Grp., Inc.*, 244 F. Supp. 3d 594, 617 (W.D. Ky. 2016) ("[T]here is no legitimate basis on which to distinguish between the attorney-client privilege and the work product protection when applying the fiduciary

1   exception in the ERISA context."); *Everett v. USAir Grp., Inc.*, 165 F.R.D. 1, 5 (D.D.C. 1995)

2   (finding that the ERISA fund attorneys may not "shield their attorney work product from their

3   own ultimate clients, the plan beneficiaries . . . insofar as [documents] were prepared in

4   anticipation of litigation on behalf of the plan beneficiaries"); *Martin v. Valley Nat'l Bank*, 140

5   F.R.D. 291, 320-21 (S.D. N.Y. 1991) (rejected work product protection claim by ERISA fund

6   attorneys in context of Department of Labor suit on behalf of fund participants); *Cobell v. Norton*,

7   213 F.R.D. 1, 13 (D.D.C. 2003) (found the work product doctrine "applicable only where the

8   material is developed exclusively for purposes other than the benefit of trust beneficiaries, *i.e.*,

9   solely to aid in litigation"); *cf. Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 626 (D. Colo.

10  1998) (acknowledged that "when the documents at issue are related to allegedly improper actions

11  of ERISA fiduciaries, discovery often is permitted despite a claim of work product privilege," but

12  refused to reach the issue of whether fiduciary exception applied); *Donovan v. Fitzsimmons*, 90

13  F.R.D. 583, 587-88 (N.D. Ill. 1981) (ordered disclosure of work product relating to ERISA

14  trustees' investment decisions, "lest the work-product immunity swallow up the [fiduciary]

15  exception in its entirety"); *see also Mett*, 178 F.3d at 1065-66 ("On the one hand, the attorney-

16  client privilege demands that a communication, obtained for a trustee's own protection, be

17  shielded from disclosure. The force of this general proposition is undiminished, irrespective of

18  whether the attorney consulted also did work for the plan. By the same token, the beneficiaries are

19  entitled to inspect communications regarding plan administration, whether or not the attorney

20  dispensing the advice is generally consulted regarding nonfiduciary matters. In the words of the

21  Second Circuit, "an employer's retention of two lawyers (one for fiduciary plan matters, one for

22  non-fiduciary matters) would not frustrate a plan beneficiary's ability to obtain disclosure of

23  attorney-client communications that bear on fiduciary matters.") (quoting *United States v. Mett*,

24  178 F.3d 1058, 1065-1066 (2d Cir. 1997)).

25        As to the applicability of the fiduciary exception, Defendant argues that that in this circuit,

26  a party's fiduciary status is determined by the following factors: (1) whether the plan instrument

27  identifies the party as the named fiduciary and (2) by applying a functional test to see if the party

28  (i) exercised any discretionary authority or discretionary control respecting management of such

*United States District Court*
*Northern District of California*

1    plan or exercised any authority or control respecting management or disposition of its assets or (ii)

2    has discretionary authority or discretionary responsibility in the administration of the plan. *See* Ltr.

3    Br. (dkt. 30) at 4 (citing *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653–54 (9th Cir.

4    2019)). Relying on *Caring for Montanans*, Defendant argues that "the fiduciary test is premised

5    on plan language and authority and control over management or administration of the plan," but

6    because Celigo's "plan is not included in Anthem's administrative record produced to Plaintiff as

7    Anthem is not in possession of the employer's ERISA plan document," Defendant submits that it

8    "has no control, direction, authority, obligations or any responsibility whatsoever over

9    management or administration of that plan," and thus, "[i]t is difficult to imagine how Anthem

10   could be _named_ as a fiduciary of a plan it does not have access to." *See* Ltr. Br. (dkt. 30) at 4

11   (emphasis added).

12         However, the fact that Defendant may not have been "named" as fiduciary in Celigo's plan

13   does not end the inquiry. "There are two types of fiduciaries under ERISA." *See Caring for*

14   *Montanans*, 915 F.3d at 653. The first is where a party is designated in the plan instrument as a

15   fiduciary – this is referred to as a "named fiduciary." *Id*. (citing 29 U.S.C. § 1102(a)(2)). As to the

16   second, "ERISA provides the following definition of what is sometimes referred to as a

17   'functional' fiduciary: '[A] person is a fiduciary with respect to a plan to the extent (i) he exercises

18   any discretionary authority or discretionary control respecting management of such plan or

19   exercises any authority or control respecting management or disposition of its assets, (ii) he

20   renders investment advice for a fee or other compensation, direct or indirect, with respect to any

21   moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

22   has any discretionary authority or discretionary responsibility in the administration of such plan.'"

23   *Caring for Montanans*, 915 F.3d at 653-54 (citing 29 U.S.C. § 1102(21)(A); and, *Santomenno v.*

24   *Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018)). Thus, "non-named fiduciaries are

25   sometimes referred to as 'functional' fiduciaries, and plan service providers[], can under the

26   named circumstances [above] become functional fiduciaries." *Id*. (citing *IT Corp. v. Gen. Am. Life*

27   *Ins. Co.*, 107 F.3d 1415, 1419-22 (9th Cir. 1997); and, *Parker v. Bain*, 68 F.3d 1131, 1139-40 (9th

28   Cir. 1995)). It is therefore entirely feasible, if not quite common, for an entity situated similarly to

United States District Court
Northern District of California

8

Defendant (*e.g.*, an insurance company, or other plan service provider, that, *inter alia*, "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, or [] has any discretionary authority or discretionary responsibility in the administration of such plan") to not be a named fiduciary in said plan, and to claim to not have a copy of said plan.

In this regard, Defendant presents conflicting arguments. On the one hand, Defendant states that "Anthem is not in possession of the employer's ERISA plan document—which is because Anthem has no control, direction, authority, obligations or any responsibility whatsoever over management or administration of that plan[,] [thus] [i]t is difficult to imagine how Anthem could be named as a fiduciary of a plan it does not have access to." *See* Ltr. Br. (dkt. 30) at 4. On the other hand, Defendant seeks to shrug the fiduciary moniker by stating that "[t]he reason the claim for optional benefits was denied was because Mr. Roldan was not eligible for optional coverage pursuant to the terms of the policy [because,] on Mr. Roldan's attempted date of enrollment, he was required to provide evidence of insurability that was approved for any optional coverage to become effective . . . [thus] [h]ere, Anthem's sole responsibility was to apply the policy terms as written based on the rules determining eligibility for benefits that were established by the employer." *See id.* at 5. It is difficult to understand how Defendant can simultaneously claim to merely be a detached outside service provider with no discretion or responsibility over plan management (e.g., by stating it doesn't even have a copy of the Celigo plan, and that "all Anthem did here was issue a life insurance policy" (*see id.* at 4)) – while also conceding that it was interpreting and applying "the rules determining [Mr. Roldan's] eligibility for benefits that were established by the employer." *Id.* at 5.

In short, it is true that agents or employees who perform "purely ministerial functions" would not qualify as fiduciaries (see 29 C.F.R. § 2509.75-8, at D-2), and neither would agents "whose sole function is to calculate the amount of benefits to which each plan participant is entitled in accordance with a mathematical formula." *King*, 871 F.3d at 746. However, at the other end of the spectrum, there is the case of an agent who has the final authority to authorize or disallow benefit payments in cases where a dispute exists – that agent would be a fiduciary by

virtue of possessing the exclusive right and discretion to interpret the terms and conditions of the plan, such as eligibility (as was the case here). *See id*. As the court explained in *King*, Blue Cross's authority to grant, deny, and review claims that had been denied was deemed to be such that any one of those abilities would be sufficient to confer fiduciary status under ERISA. *See* fn. 5 *supra*. The same conclusion appears unavoidable in this case by virtue of *King*'s reasoning because Defendant was vested with the final authority to determine Mr. Roldan's eligibility (which is, put another way, the exclusive right and discretion to interpret a central issue regarding the administration of the plan – eligibility), as well as being vested with the authority to grant, deny, and review denied claims. To drive home the point, this conclusion is bolstered by Defendant's confirmation that, "[a]t every point in this claim process" it was vested with the authority to interpret and apply "the [eligibility] rules imposed by the employer." *See* Ltr. Br. (dkt. 30) at 5. For these reasons, the undersigned concludes that Defendant must be considered a fiduciary under ERISA – in a general sense.

At this point in the analysis, the Parties' Letter Brief simply drops off – that is, with Plaintiff simply asserting that Defendant is a fiduciary under ERISA and that wholesale discovery of the redacted materials should be compelled without regard to Defendant's assertions of attorney-client privilege and the work product doctrine, and with Defendant asserting that the fiduciary exception does not apply because it is not a fiduciary. *See generally* Ltr. Br. (dkt. 30) at 1-5.  However, by no means does the inquiry simply end here, as Plaintiff appears to suggest. It goes without saying that "the 'fiduciary exception' to the attorney-client privilege is not the all-access pass that Plaintiff seeks." *See Schoenberger v. Securian Life Ins. Co.*, 2023 U.S. Dist. LEXIS 202201, *7-8 (W.D. Wash. Nov. 2, 2023). After describing the two distinct rationales justifying the fiduciary exception, the court in *Mett* clarified that, "[o]n either rationale, however, it is clear that the fiduciary exception has its limits – by agreeing to serve as a fiduciary, an ERISA trustee is not completely debilitated from enjoying a confidential attorney-client relationship." *Mett*, 178 F.3d at 1063; *see also Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 932 (9th Cir. 2012). *Mett* addressed these limits in some detail while considering whether the fiduciary exception applied to a pair of memoranda written by a law firm that "wore many hats, serving at

various times as counsel to [two ERISA trustees] personally and in their capacities as ERISA plan trustees, to [a corporation] as a corporation and in its role as plan administrator, and to the ERISA plans themselves." *Mett*, 178 F.3d at 1062. The memoranda were written to the trustees and "relate[d] to the potential civil and criminal consequences" the trustees might face due to illegal actions they had taken in administering an ERISA plan. *Id*. In deciding whether this sort of documentation fell within the fiduciary exception, *Mett* identified "two ends of a spectrum," where, "[o]n the one hand, [] an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries[,]" but, "[o]n the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact." *Id*. at 1064. The memoranda at issue in *Mett* were held to fit into the latter category. Conversely, the documents involved in *Stephan*, 697 F.3d at 932, were situated at the other end of the spectrum. Those documents were "notes of conversations between Unum claims analysts and Unum's in-house counsel about how the insurance policy under which *Stephan* was covered ought to be interpreted and whether Stephan's bonus ought to be considered monthly earnings within the meaning of the Plan." *Id*. Thus, unlike the memoranda involved in *Mett*, the disputed documents offered advice solely on how the Plan ought to be interpreted and did not address any potential civil or criminal liability Unum might have faced, nor was there any indication that they were prepared in contemplation of any such liability. *See id*.

"There is no binding precedent in this circuit delineating precisely when the interests of a Plan fiduciary and its beneficiary become sufficiently adverse that the fiduciary exception no longer applies." *See Schuman v. Microchip Tech. Inc.*, 2019 U.S. Dist. LEXIS 157099, *4-5 (N.D. Cal. Sept. 13, 2019) (quoting *Stephan*, 697 F.3d at 933). Those courts that have considered the issue "have repeatedly rejected the argument that the prospect of post-decisional litigation is enough to overcome the fiduciary exception." *Stephan*, 697 F.3d at 933 (quoting *Allen v. Honeywell Ret. Earnings Plan*, 698 F. Supp. 2d 1197, 1201 (D. Ariz. 2010) (internal quotation marks omitted). Most often, courts have concluded that it is not until after the final administrative

United States District Court
Northern District of California

appeal that the interests of the Plan fiduciary and the beneficiary diverge for purposes of application of the fiduciary exception. *Id.* The *Stephan* court noted its agreement with that notion and explained that because "[t]he context of the documents at issue here — communications *in advance* of Unum's decision on Stephan's appeal — indicates that their goal was the determination of Stephan's pre-disability earnings, a matter of plan administration, and was not preparation for litigation . . . [a]bsent some other basis for withholding them, the district court, on remand, should permit discovery of the documents." *Id.* (emphasis added). Thus, in *Stephan*, the court found that *the context* of the redacted information operated to confirm this conclusion because: "[w]hereas the Mett memoranda were prepared to advise ERISA trustees 'regarding their own personal civil and criminal exposure in light of undocumented withdrawals that had already occurred,' the [*Stephan*] documents [] were prepared to advise Unum claims analysts about how best to interpret the Plan, and were communicated to the analysts before any final determination on Stephan's claim had been made." *Id.* Accordingly, context and timing were used to determine that "[t]he content of the [*Stephan*] documents was [] about plan administration, a topic to which, under *Mett*, the fiduciary exception applies." *Id.* (quoting Mett, 178 F.3d at 1064).

Here, the redacted documents are part of the administrative record, which is highly indicative, but not quite conclusive, that they were produced or prepared before the conclusion of Defendant's decision on Plaintiff's appeal of the eligibility decision. It is also highly indicative – but, again, not conclusive – that the scant information in the privilege log (*see* Ltr. Br. (dkt. 30) at 9) tends to support a conclusion that the redacted communications pertained to Defendant's eligibility determination because they were communication between claims administration personnel and its in-house legal personnel *during* the claims administration and review process.[7]

---

[7] Plaintiff's portion of the Letter Brief also takes issue with the lack of specificity in Defendant's privilege log. Specifically, Plaintiff complains that "[t]he log does not identify any specific recipients triggering the alleged attorney-client privilege; rather, it only states that the recipients are 'Various persons – legal department.'" *Id.* at 2 (citing id. at 9). For one document (Bates No. ABCLH000234), Plaintiff complains that there is no indication that an attorney either drafted or received that document; and, under the "Description" column, Plaintiff complains that Defendant claims that the documents were created "in anticipation of litigation," a designation which Plaintiff contends is belied by the fact that the majority of the documents were generated before Plaintiff's claim was denied, much less appealed (*see id.*). Plaintiff states that "[a]t that time, there was absolutely no reason to anticipate litigation." *Id.* In that vein, Plaintiff also contends that Defendant's reliance on the work product doctrine (as asserted in the privilege log) is misplaced

**CONCLUSION**

In light of the above, the court orders as follows: to the extent that the redacted information fits within the *Stephan* rubric (*i.e.*, if the redacted information pertains to the eligibility determination rendered by Defendant), Plaintiff's request to compel the lifting of those redactions is **GRANTED** and Defendant is **ORDERED** to produce that information in unredacted form forthwith; on the other hand, if the information falls within the *Mett* rubric (*i.e.*, that it is related to potential civil or criminal consequences of actions taken by Defendant), then Defendant is **ORDERED** to promptly revise and update its privilege log with sufficient detail such that the basis for which Defendant contends that the redacted information is situated at the *Mett* end of the spectrum described herein can be clearly understood. The court **FURTHER ORDERS** that in the event that Defendant's revised privilege log falls short of that mark, and the subject remains in dispute, the Parties shall promptly submit – by way of joint letter brief – their respective positions on the court reviewing the redacted material *in camera*, such that the court can determine at which end of the *Mett* spectrum the disputed information is situated.

**IT IS SO ORDERED.**

Dated: January 29, 2024

ROBERT M. ILLMAN
United States Magistrate Judge

---

because it only protects the work of an attorney that was prepared in anticipation of litigation, not documents that were produced during routine ERISA claims handling – which Plaintiff asserts to have been the case here. The court agrees with Plaintiff's concerns about the dearth of information in Defendant's privilege log, and about the timing issues (*i.e.*, the fact that it appears highly likely that the redactions here fit into the *Stephan* rubric, rather than the *Mett* rubric).

United States District Court
Northern District of California